# Pannell *versus* The Commonwealth.

1. In a trial for murder, where it is endeavored to be shown that the prisoner was insane, the proof thereof must be by satisfactory and fairly preponderating evidence, but it is not necessary it should be so conclusive as to remove all doubt.

2. In a capital case, where it is likely the jury, to the injury of a prisoner, may have misunderstood a doubtful instruction of the court on any material question, this court will reverse, even though the language of the instruction is modified by appropriate language in other portions of the charge.

3. Where a witness has testified in chief, that he was acquainted with the prisoner, and had seen and conversed with him many times, and had not discovered anything which led him to believe he was insane, it is error to refuse to permit the witness to be asked on cross-examination, "whether he saw enough in his intercourse with the prisoner, to warrant him in expressing an opinion as to his sanity or insanity."

4. In view of the fact that murder can be committed by none other than a person of sound memory and discretion, in a trial for murder, where the insanity of the prisoner is endeavored to be shown, it would seem that the proper form to put the question to witnesses would be, "was he of sound or unsound mind," rather than, "did you or did you not discover anything that led you to think he was insane."

[Pannell v. Commonwealth.]

5. The knowledge and experience of medical experts is of great value in questions of insanity, and where evidence has been given of their observation, experience and skill, sufficient to enable them to form intelligent opinions and they have testified to these opinions, it was error for the court to charge the jury; "we question very much whether you will realize much, if any, valuable aid from them, in coming to a correct conclusion as regards the responsibility for crime by this prisoner."

February 11th and 12th 1878. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and TRUNKEY, JJ. WOODWARD, J., absent.

Error to the Court of Oyer and Terminer of *Lancaster county:* Of May Term 1878, No. 102. Certified from the Middle District.

Indictment of James E. Pannell for the murder of his wife, Anna E. Pannell. Plea, "not guilty." The evidence produced at the trial disclosed the following facts: Pannell was born in Maryland in 1843. He lost both of his parents at an early age and was taken by an uncle in Lancaster county, Pennsylvania, who cared for and educated him as a son. As he grew towards manhood he became dissipated and reckless, and finally was discarded by his uncle, upon whom he had forged a check for $1500. After an absence of several years he returned to Lancaster in 1875 and early in 1876, when at a religious revival made the acquaintance of Anna E. Hedricks, to whom, after making some inquiries about her, he paid his addresses, and in April 1876 they were married. They went to housekeeping in a house procured by Pannell and for a time lived, to all appearances, pleasantly and happily together, the prisoner, during this time, working as a carpenter, having during his wanderings obtained some knowledge of that trade. In May 1876, it appeared there was a quarrel between them, the mind of Pannell seeming to be possessed with an idea that his wife was unfaithful to him, It appeared also that he was on some occasions irritable and quarrelsome, and upon others kind and loving. At this time the prisoner was employed on the Centennial grounds in Philadelphia, and made weekly visits to Lancaster. Upon one of these visits, on July 4th and 5th 1876, he again quarrelled with his wife, during which he struck her and threatened to kill her, and was only prevented from doing her more serious injury by the interference of her mother. On the evening of the same day he again made threats that he would murder her. He seemed at this time very much depressed in spirits, and on leaving took a part of his wife's clothes with him and expressed the hope that he would be killed by the cars on his way to Philadelphia; that his heart was broken and his family broken up, and Anna would not live with him any more. He returned to Lancaster on the 20th of July and went to the house, in the third story of which Mrs. Hedricks, his mother-in-law, was living, having moved in

[Pannell *v.* Commonwealth.]

his absence. He slept that night on a lounge in the apartments of the family who occupied the lower stories of the house, and next morning took breakfast with Mrs. Hedricks, and afterwards went to see his wife, who was then employed as a dining-room girl at the Keystone Hotel. His object in seeing her, it seemed, was to effect a reconciliation, for on his return he remarked to Mrs. Hedricks, " he had seen Anna and she told him she wouldn't make up with him." He dined with Mrs. Hedricks on that day, and requested her to remain in the house, as Anna was coming that evening. Anna came about half-past eight o'clock, and after some conversation in regard to her little brothers, said, " Mother, I have something to tell you." The prisoner then took a chair and sat down beside her and the children. The deceased then again remarked, " Oh, mother, I have something to tell you." The prisoner then said to her, " I must tell you something. I want to talk a little business to you this evening." She replied, " Pannell, I feel good this evening, and I didn't come here to quarrel or make any fuss with you. I tell you now as I told you to-day, I'll freely forgive you for all you have done to me, and I have made up my mind I will never live with you again." The prisoner then arose and replaced the chair whence he had taken it and then went to the window and looked up and down the street. He then returned and standing close by the side of the deceased, said to her, " Anna, you look beautiful. Anna, we will make up to-night or we will part for ever," and as he used the last words he discharged a pistol at her, the ball of which lodged in her left cheek. He then withdrew a few feet and reloaded the pistol, and approaching near to the deceased, again shot her in the head. The deceased never spoke after the second shot and died early on the following morning. After the shooting the prisoner attempted to escape by going out on the balcony of the third story and sliding down a post to the second story, where he was arrested. When arrested he begged the officer " not to let the crowd handle him roughly." When asked by the officer what he had been doing he said, " I killed her, God damn her ! it was just what she ought to have ;" and when asked why he had shot her twice, replied, " I shot to kill the God damned whore," and when told she was dead, said, " she ought to be in hell long ago."

The defence alleged that the prisoner was insane. It was claimed that he had hereditary insanity, and to support this claim evidence was offered to show that his mother was insane and committed suicide. There was evidence by members of his family and neighbors, that in early life there were indications that he was of unsound mind. The testimony of those who knew him for the period immediately preceding the murder, concurred, however, in the opinion that there was nothing in the prisoner's conduct to induce the

[Pannell v. Commonwealth.]

belief that he was insane. The evidence of the medical experts in regard to his insanity was about equally balanced.

At the trial, before Patterson, J., the Commonwealth put the following question in chief to a number of her witnesses : "In all the intercourse you had with the prisoner, during the period of your acquaintance, with all your observation of his conduct, manner and appearance, did you or did you not discover anything that led you to think that he was insane ?"

These questions were permitted under objection, and formed the subject of numerous assignments of error.

One of these witnesses for the Commonwealth, having testified that he was acquainted with and had had frequent association with the prisoner, and that he did not discover anything which led him to think he was insane, was asked, on cross-examination, "Did you or did you not, from all that you have related concerning this defendant, discover anything upon which you could base an opinion as to whether he was sane or insane ?" The witness replied: "I saw nothing that would lead me to believe that he was insane." He was then asked, "Did you or did you not see enough in your intercourse with this defendant to warrant you in expressing your opinion as to his sanity or insanity, your attention not having been called to the fact ?" The objection to this question was sustained, and exception sealed.

Among the points presented by the prisoner was the following :

If the jury believe that at the time the homicide was committed the defendant, James E. Pannell, was insane, he must be acquitted.

Ans. "This point the court answers in the affirmative, as an abstract proposition, but add, that the jury must be satisfied, by satisfactory and conclusive proof, of the insanity of the defendant. The party alleging insanity must prove it, and the burthen of proof is upon the defence, to convince you that the mind of the defendant was deranged, and so deranged as to make him irresponsible. If the jury so believe, from all the evidence in the case, then defendant must be acquitted."

In their general charge, the court, inter alia, said, ["We had almost concluded to leave the question of insanity to you, with the comments of the able counsel for the Commonwealth and the counsel for the prisoner, and simply remark that it is a question of fact for you to determine from the evidence, and if made out beyond a reasonable doubt, it is a good defence, and must acquit the prisoner.] * * * The law presumes sanity. In all criminal trials, the person charged with the commission of the offence must be taken to be of sound mind until the contrary is shown, and, therefore, to make insanity a good defence, it must be proven to the satisfaction of the jury.

"The burden of the proof rests upon the defendant. Hence, you have seen that, under the rules of evidence, the court have

[Pannell *v.* Commonwealth.]

admitted, and both the parties, pro and con, in this trial, have availed themselves of the opinions of distinguished medical writers; indeed, of medical science, in the calling of witnesses, termed experts; gentlemen of the medical profession, who have studied the human system, and the symptoms which are supposed to determine the presence of insanity; and also a number of other witnesses, not professional, who knew the prisoner, and saw and had personal contact with him, had conversations with and made their own observations of him.

" When you look at the medical testimony called on the one side and the other, you discover a diversity of views, and directly opposite professional opinions.   There is not any more diversity amongst the other witnesses called to testify, than there is difference between the experts themselves.   This is not unusual, and especially in cases like the present, when insanity is pleaded as the extenuation. * * * [Now, whilst the medical witnesses may be paramount, and their opinions, in many instances, greatly superior to that of other witnesses in aiding a jury to come to a correct conclusion in many kindred subjects arising in criminal causes, the nature of their profession having directed their attention to the subjects, yet, in the case now trying, we question very much whether you will realize much, if any, valuable aid from them, in coming to a correct conclusion as regards the responsibility for crime by this prisoner.

" You must be satisfied from the evidence that this was a case of insanity, and therefore you must form your own opinion, and as ordinary men of the world, as men seeking the truth.   You may be as well qualified to form an opinion as any other on this subject-matter."]

The court then proceeded to review the different theories and classifications respecting mental diseases, and in another portion of the charge said :—

" [Now, whether all or any of those conditions existed in the prisoner at the time of the killing, is simply a question of fact, to be established, if possible, by conclusive and satisfactory evidence. The accused acting under those conditions of mind, is assumed to have been an *in*voluntary agent or actor.]   That must be proven to your satisfaction before you can acquit."

The verdict was " guilty of murder in the first degree."   After sentence the prisoner took this writ, assigning forty-six errors. Among them were those assigned to the admission of evidence as above noted, the answer to the defendant's point, and the portions of the charge in brackets, which are the only assignments passed upon by this court.

*S. H. Reynolds* and *William Aug. Atlee,* for plaintiff in error.— " Did or did you not discover anything that led you to think he was insane?"   We contend that this question indicates to the wit-

[Pannell *v.* Commonwealth.]

ness the difficulty he must find in having any such thought; the use of the word "anything," indicates to him that there is nothing to lead the mind in that direction, and the whole question indicates to the witness that the answer which it is wished he should make is "No."

Another objection to the question is that the witness has not stated facts to enable him to form an opinion. The rule of the admission of testimony of non-experts undoubtedly is that the witnesses must state facts and circumstances sufficient to enable them to form an opinion, and then, having thus given the jury an opportunity to test the soundness of their opinions, they may give their opinions. But "facts and circumstances are to be sworn to as the groundwork of the opinions offered:" Bricker *v.* Lightner's Executor, 4 Wright 199.

To instruct the jury that they must be satisfied beyond a reasonable doubt of the prisoner's insanity is erroneous: Meyers *v.* Commonwealth, 2 Norris 131. *Conclusive* is equivalent to reasonable doubt. It admits only of the construction that there must be no doubt in the minds of the jury: Hiester *v.* Laird, 1 W. & S. 245.

It is argued, however, that the jury could not have been misled by this language, because the whole charge was such that they must have gathered from it that the court instructed them that "the evidence need be only satisfactory to them;" that they could not have been wrongly impressed, and that, therefore, under the doctrine of Green *v.* Commonwealth, 2 Norris 75, the error was cured. We contend, however, that in the four times in which the court alludes to this subject their instruction was so strong that none of the language of the context can qualify it.

Ordinary men of the world cannot be so well qualified to form an opinion on such a subject-matter as insanity as those who have devoted more years to its examination, treatment and study, than most of the members of the jury have lived. Diseases of the brain are hidden; at the same time they may be simulated. It takes the skill and experience of the medical man in some cases to discover the disease or detect the simulation. Some phases of insanity are discoverable of all men; extreme cases are patent to every eye; but there are others not so patent, which the ordinary observer cannot see, and he cannot be so well qualified to pronounce an opinion on the case as the experienced physicians who have had more than twenty years' acquaintance with the patient. The value of such testimony is recognised in Pidcock *v.* Potter, 18 P. F. Smith 342.

*J. B. Amwake, M. Brosius* and *J. W. Johnson,* District Attorney, for the Commonwealth.—The measure of proof required to warrant an acquittal on the ground of insanity is definitely determined and declared in a series of cases in the last five years, ending

[Pannell *v.* Commonwealth.]

with Commonwealth *v.* Meyers, 2 Norris 141, which says, "it must be satisfactory, such as flows fairly from a preponderance of the evidence." This measure of proof has been stated in various forms of expression: Ortwein *v.* Commonwealth, 26 P. F. Smith 421; Lynch *v.* Commonwealth, 27 Id. 207; Brown *v.* Commonwealth, 28 Id. 123. To make the opinion of a witness that a person is insane, competent evidence, he must state some facts fairly indicative of insanity: Rambler *v.* Tyron, 7 S. & R. 90; Dickinson *v.* Dickinson, 11 P. F. Smith 404. The question whether the witness is qualified to testify as an expert is to a large extent within the discretion of the judge trying the cause, and a court of review will not interfere, except in a clear and strong case: Pidcock *v.* Potter, 18 P. F. Smith 342; Del. & Chesapeake Steam Tow-boat Co. *v.* Starrs, 19 Id. 36; Sorg *v.* First German Congregation, 13 Id. 156; Dole *v.* Johnson, 50 N. H. 452.

Mr. Justice MERCUR delivered the opinion of the court, May 6th 1878.

Forty-six errors are assigned. Many of them were not pressed on the argument, and have no special merit.

The killing of Anna C. Pannell by her husband, the plaintiff in error, is not questioned. The sole ground of defence urged to secure an acquittal, or to lessen the grade of the crime, was the unsound mind of the prisoner. We cannot say that there was not much evidence tending to prove him to be of unsound mind. If several of the witnesses were believed, the opinion of his insanity was not first entertained after the commission of this act, but existed, and was expressed, many years prior thereto. It was claimed that he had hereditary insanity. To sustain this view evidence was given that the mother of the prisoner was of unsound mind and committed suicide.

The only plea being that of insanity, and some eight or ten witnesses having testified to facts in support of that plea, it was rather an unfriendly remark of the learned judge, when he said to the jury, near the commencement of his charge, "should it become necessary in your judgment to consider the evidence bearing upon the plea of the prisoner, and by which it is claimed he is entitled to palliation or excuse." In its effect it was equivalent to saying, should it become necessary for you to consider whether he has any defence. As he had no other defence, the jury may well have considered that the judge expressed a doubt whether they should deem the evidence of sufficient importance to consider it.

The homicide occurred some three months after the parties were united in marriage. At times he appeared to doubt the faithfulness of his wife. Sometimes he was irritable, cross and quarrelsome. At others he was loving and kind towards her. The defence rested on hereditary taint, his own conduct and appearance for many

years, and his fickle and unreasonable conduct toward his wife. It was not claimed that his insanity was of that type which is manifested in the paroxysmal or frenzied action of a maniac ; but that, in a more subdued form, his mind was dethroned. This distinction was not very prominently presented in the charge, and the omission so to do may possibly have misled the jury ; yet it is not so clear as to require us to say there was positive error therein. The assignments, from the 5th to the 25th inclusive, excluding the 9th, 21st, 22d, 23d and 24th, are designed to present this distinction. They cover objections to the form in which the question was put to the witnesses on the part of the Commonwealth. It was, " Did you or did you not discover anything that led you to think he was insane ?" It was contended the word " insane" implied a higher degree of mental alienation than was necessary to exculpate the prisoner, and that the form of the question indicated the answer desired. In view of the fact that murder can be committed by none other than " a person of sound memory and discretion," it may be that the better form would be, " Was he of sound or unsound mind ?" Yet, inasmuch as the witnesses' understanding of what constituted insanity, as well as what constituted unsound mind, can be ascertained on cross-examination, we do not see that the rights of the prisoner were prejudiced by the use of the word insane ; nor do we think the question was so leading as to make it objectionable.

The disallowed question covered by the 9th assignment was put under these circumstances : The witness had testified in chief to his acquaintance with the prisoner ; that he had seen him many times, and conversed with him, and did not discover anything which led him to believe the prisoner was insane. It did not appear that his attention had ever been called to observe or notice whether he was insane.

So on cross-examination he was asked whether, from all he had related, he discovered anything on which he could base an opinion as to whether the prisoner was sane or insane. Avoiding any answer as to whether he discovered anything on which he could base an opinion that the prisoner was sane, he replied that he saw nothing which led him to believe the prisoner was insane. Then in view of the fact that the witness's attention had not been called to observe the condition of the prisoner's mind, he was asked whether he saw enough, in his intercourse with the prisoner, to warrant him in expressing an opinion as to sanity or insanity. Substantially the question was whether he had scrutinized him with sufficient attention to form an intelligent opinion in regard to the condition of his mind. As the weight to be given to the opinion of the witness depended much on this fact, there was error in disallowing the question.

The 26th, 34th and 36th assignments present the question, to

[Pannell *v.* Commonwealth.]

what degree or extent must the insanity of the prisoner be proved in order to acquit him ? The court was asked to charge, "if the jury believe that at the time the homicide was committed the defendant was insane, he must be acquitted." The court answered this in the affirmative as an abstract proposition, but added "that the jury must be satisfied by satisfactory and conclusive proof of the insanity of the defendant."

That the proof of insanity must be satisfactory, and not merely doubtful, to justify an acquittal, is undoubtedly correct ; but we do not know any case in which it has been held that it must be conclusive. To require it to be absolutely conclusive, is asking for too high a degree of certainty. It is not necessary that the proof of insanity should be so conclusive as to remove all doubt. It may be established by satisfactory and fairly preponderating evidence: Ortwein *v.* Commonwealth, 26 P. F. Smith 421 ; Lynch *v.* Same, 27 Id. 207 ; Brown *v.* Same, 28 Id. 123 ; Meyers *v.* Same, 2 Norris 131. It is contended on the part of the Commonwealth that, conceding the word "conclusive" is objectionable as thus used, yet, inasmuch as the court in several other parts of the charge said the evidence need be satisfactory only, the general effect of the charge did no injury to the prisoner. To this we answer, an examination shows the same objectionable language, substantially, used in other places. Thus in the portion of the charge covered by the 34th assignment, in commenting on the evidence tending to prove insanity, the court said: " If made out beyond a reasonable doubt, it is a good defence and ought to acquit," thereby clearly indicating that any less degree of proof was not sufficient.

Again, in the 36th assignment, after presenting the different kinds and phases of mental diseases, the court said, "Now, whether all or any of those conditions existed in the prisoner at the time of the killing, is simply a question of fact, to be established, if possible, by conclusive and satisfactory evidence." The jury might have understood the court to here say that it was not possible to establish insanity otherwise than by conclusive evidence. The effect of the language we have quoted is so far modified by the use of appropriate language in other portions of the charge, that in a case not capital, we might not feel required to reverse. In this case, where the life of a human being is at stake, he has a right to demand that the case shall be submitted to the jury under no doubtful instruction on a vital question. It is impossible to tell whether the jury acted on the opinion that satisfactory and preponderating evidence was sufficient to establish insanity, or whether "conclusive" evidence so strong as to establish it "beyond a reasonable doubt" was necessary. These assignments are sustained.

The language of the court covered by the 35th assignment was certainly calculated to detract from the weight proper to be given to medical testimony. Much that was said in regard to such testi-

[Pannell *v.* Commonwealth.]

mony was wholly unobjectionable, and entirely correct; but there was error in adding, " yet in the case now trying we question very much whether you will realize much, if any, valuable aid from them in coming to a correct conclusion as regards the responsibility for crime by this prisoner." Four medical witnesses had testified to the effect that the mind of the prisoner was unsound. They were all educated men, and of large experience in their profession. Two of them had resided near the father of the prisoner. They had knowledge of the mental disease of his mother, and had known the prisoner personally for several years. Their means of observing him and of forming an intelligent opinion as to the condition of his mind had been most ample. To their full observation as men, they had applied their scientific knowledge as experts, and testified to the result. The other two had testified as experts only, predicated on the assumed truthfulness of the facts testified to by others.

It is well settled that the knowledge and experience of medical experts is of great value in questions of insanity. They are like those of experts in all other branches of science and of art. Evidence had been given of the observation, experience and skill of these medical experts, sufficient to enable them to form intelligent opinions, and they had testified to those opinions. We cannot understand on what principle the learned judge said to the jury that in this case he questioned very much whether they would realize much, if any, valuable aid from their testimony. True, the jury were not bound to adopt the conclusions of the experts ; yet they should have been instructed to give a careful consideration to the testimony of those who had made the diseases of the human mind a special study. In a former part of the charge the jury was told that " great respect should be paid to the opinion of that class of witnesses," followed by other remarks equally correct. Yet, when the court came to apply the testimony to the case trying, its effect was almost destroyed. We see no especial circumstances in this case to justify taking from the evidence of these medical witnesses that consideration to which the testimony of experts is generally entitled.

As the case is to go back for another trial, it is not necessary to discuss the assignment relating to the taking of the verdict, nor to matters subsequent thereto. In so far as the other assignments are not covered by what we have said, they are not sustained.

Judgment reversed and *venire facias de novo* awarded.