Commonwealth v. Frantz Bezek, Appellant.

168    603
¹218 .  491

*Criminal law—Murder—Continuance—Discretion of court.*

The Supreme Court will not reverse a judgment on a verdict of guilty of murder in the first degree because the lower court refused a continuance, where there is nothing on the record to show an abuse of discretion in the action of the lower court, or that a postponement of the trial would have resulted in strengthening the defense in any respect.

*Evidence—Blending relevant with irrelevant matters—Review.*

In civil cases the rule of evidence is that "where an offer blends irrelevant and inadmissible matters with a matter relevant and admissible, and it is made and rejected as a whole, the rejection of it is not error;" but this rule ought not to be summoned to sustain a ruling prejudicial to the interests of a defendant on trial for murder.

Where an offer of evidence is improperly rejected, but immediately afterwards under another offer the evidence is admitted in full, the ruling on the first offer is not a ground for reversing the judgment.

*Murder—Insanity—Evidence.*

Insanity is an independent defense, and he who sets it up must show the existence of it by fairly preponderating evidence.

*Evidence—Confession—Voluntary statement.*

Where a prisoner is warned that any statement he might make concerning a murder with which he is charged may be used against him, and that he need not say anything about it unless he desires to do so, and he subsequently makes a statement, such statement may be used as evidence at his trial.

Argued Feb. 25, 1895. Appeal, No. 243, Jan. T., 1895, by defendant, from judgment of O. & T. Lackawanna Co., on verdict of guilty of murder in the first degree. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, and MITCHELL, JJ. Affirmed.

Indictment for murder.

Defendant moved for a continuance of the case for the reason that counsel for the defense was assigned by the court Friday noon, that the case was called for trial Monday following ; that defendant did not understand the English language and no interpreter could be procured, and therefore counsel would be compelled to go to trial without having an opportunity to prepare the case. The court refused the motion. [1]

At the trial it appeared that on Oct. 9, 1894, the prisoner shot and killed Maria Kerzek. Prior to the shooting the prisoner asked the deceased to marry him, and she refused. The prisoner claimed that he then attempted to shoot himself, and that the girl rushed towards him to prevent the shooting, and in the struggle the revolver was discharged, and the girl was shot.

The counsel for defendant proposed to prove by the witness on the stand, John Karocious, that he had known the defendant since childhood; that his name is Frank Pershon; that the witness is the defendant's father's half-brother; that about five years ago, while Frank was in the Austrian army he was confined in Liebach asylum for the insane; that he was confined there, having become insane at two different times in his lifetime, on account of this girl, Maria; that he saw him at Mayfield, arriving in this country with her; that they remained at his place until Maria went to Olyphant; that the defendant told the witness after he learned that Maria would not marry him that he was going to kill himself and witness advised him not to do so, but to go to work with him.

To be followed by evidence of witnesses who saw the defendant confined at the asylum at Liebach, and those who knew of his having been confined there; also evidence showing that he stated that he would take his life if Maria refused to marry him; also to be followed by evidence showing that he has been confined at the asylum at Liebach within ten months of this trial.

By the Court: " How does the mere fact of this man having been in an insane asylum tend to prove his insanity?"

By defendant's counsel: " It may not establish insanity just now."

By the Court: " How does it establish it then?"

By defendant's counsel: " This will go to corroborate other witnesses. It would be prima facie evidence that he was insane. This man is not offered as an expert as to whether the defendant was insane or not, but simply that the man was incarcerated and he knew that he was in the insane asylum."

By district attorney: " The commonwealth objects to the whole offer as immaterial, irrelevant and incompetent."

By the Court: " I will sustain the objections and exclude the evidence. Exception noted for defendant, and bill sealed." [2]

John Karocious was asked this question by defendant's counsel: "In what part of the hospital did you see Frank in Austria? In what part was he confined?"

By the district attorney: "The commonwealth objects to the question as immaterial, irrelevant and incompetent."

By the Court: "I sustain the objection." [3]

"Anthony Kranz testified for the defendant that he saw him in the hospital, which hospital was alleged to have been a hospital for the treatment of insane persons, in Liebach, Austria; and the question was asked by the defendant's counsel —'How did he act?' The answer being—'He acted like crazy.'"

By the district attorney: "The commonwealth objects to the answer, and asks that it be stricken out."

By the Court: "It may be stricken out." [4]

The counsel for the defense proposed to prove by Anton Bourschnak that he furnished the money to Mr. and Mrs. Kramer as a loan, and that they purchased the ticket upon which Maria came to America; that after her arrival in America, Mrs. Kramer in the presence of Frank, said that Maria should marry witness; that witness said he did not care to marry Maria, but wanted his money back. This for the purpose of contradicting Mrs. Kramer on the point where she swore that Anton Bourschnak bought the ticket for her to come to America, with the understanding that he was to marry her when she got here. That there was no such understanding between Maria and Anton Bourschnak, and that Anton Bourschnak did not know that he was to marry Maria until Mrs. Kramer asked him to in the presence of Frank, after their arrival.

By the district attorney: "The commonwealth objects to the offer as irrelevant and immaterial for that purpose. Further, that it is not an offer to contradict the commonwealth's evidence on a material point. That it is not a material contradiction."

By the Court: "I sustain the objection and exclude evidence. Exceptions noted for defendant and bill sealed." [5]

Counsel for defendant proposes to prove by the same witness that he furnished the money to Mr. and Mrs. Kramer as a loan. That they purchased the ticket upon which Maria came to America, and this for the purpose of contradicting the testimony of Mrs. Kramer when she testified that the witness sent the ticket to her sister, Maria, to come to America.

By the district attorney : " The commonwealth objects to the offer as immaterial, irrelevant and incompetent."

By the Court: " Objection sustained. Evidence excluded. Exception noted for defendant, at whose request a bill is sealed." [6]

C. I. Berger, called by the commonwealth, testified as follows :

" Q. Now before this defendant made any statement there in reference to this affair did the Squire say anything to him, that is through the interpretation of you and Mr. Magenreider, was there any communication from the Squire to the defendant as to the effect of what he would say ? A. Mr. Cummings spoke him several times. Q. What did he say ? A. ' Ain't got no use to talk here.' Q. Why ? A. Well, I don't know why. Q. Did the Squire tell him why he could not talk ? A. Squire Cummings said he ain't got no use to talk here. Q. Was that communicated to the defendant through Magenreider and you ? A. Then he told us any way. Q. The Squire, you say, told him no use to talk there. Now, did you make known, did you and Magenreider make known to the defendant what the Squire said ? A. Yes, sir. Q. Then you say he told you any way. What I am trying to get at is, you say that you heard the Squire tell him that he had no use to talk there. Now, of course, he couldn't understand it. What I am trying to get at is this : Did you and Magenreider explain to the defendant what the Squire said ? A Yes, sir, we did. Q. Now, after that warning of the Squire was communicated to the defendant, tell us what the defendant said that you heard and understood ? "

By counsel for defendant: " If you honor please, we would object upon the ground that he got it as hearsay from Magenreider, and interpreted to him ; he did not get it from the defendant himself, but got it from another interpreter."

By the Court: " He has already said that he understood what the defendant said to the other interpreter, and he also understood what the interpreter said to the defendant."

By counsel for defendant: " We will enter another objection."

By the Court: " I do not desire any reflection to be cast upon the court, because we desire to do everything that is possible for this defendant. The court ruled that it is only the

person to whom the defendant talked, or who could understand him, or who heard him and understood him, that can give the testimony, and therefore ruled out the evidence of Mr. Cummings.   This witness says that he understood this defendant himself without the aid of the other interpreter.   Now, that comes exactly within the rule."

By the district attorney: Q. " Tell us what the defendant said that you heard and understood?"

By counsel for defendant: "We renew the objection.   To-day the witness on the stand, it was either to-day or yesterday, was asked to converse with the defendant, and he then stated that he could not speak the language, but another gentleman could speak the language.

"It seems to me that this man under arrest in that alderman's office, surrounded by all these wiseacres, should have been warned by more than to say 'he has no use to talk;' that is all that was communicated to him, so this gentleman says; whether he was led to make this statement in his condition or not is a question it seems to me that is material, whether they have a right to come in here after having him in duress, getting this confession out of him, or this statement, without warning him more than he says they did warn him, by the alderman making the naked statement that 'he has no use to talk,' and he says he communicated that to him; no use to talk means nothing, as I understand it.

"We enter an objection that he was under duress."

By the witness: "I said before I can talk some, and some I cannot."

By district attorney: " Q. Now please answer the question? A. Well the first question was, what he said.   Of course, we asked him how it was, and he said he loved Maria about three years in the old country, and he came in to marry her.   Then he said, 'Never mind, bring me to the priest;' he wants a priest, 'and then hang me.'   That is what he said in the Squire's office.   Then we asked where he bought the revolver, when he bought the revolver.   He said that same morning; then asked him whereabouts; this side of the bridge or another side of the bridge, and he said this side of the bridge.   That is all what he said.   Q. Was there anything said that you heard about him showing the constable where he got the revolver?   A. No, sir.

Q. You didn't hear anything of the kind?    A. No, sir.    Q. Or was there anything said about the price he paid for the revolver?    A. No, sir.    Q. You didn't hear anything of the kind?    A. No, sir.    Q. Did you have another conversation with the defendant at the county jail afterwards?    A. Yes, sir.    Q. When was that?    A. That was to-day three weeks.    Q. What conversation did you have with him there?    A. I asked him, because he didn't know me, I asked him, ' What for you in here?' ' Well,' he said, ' I shoot a lady up in Olyphant.'    Well, I asked him, ' What for you done that?'    Well, then he told me, he said, ' Because I was excited; I loved her out in the old country, and I came in and she didn't want me here,' and then he ask me about how much he get.    I said, ' I don't know;' then he write me a letter in the county jail to Mrs. Kramer, and I took that along and I went out." [14]

The counsel for the defendant moved to have the evidence of the last witness, C. I. Berger, stricken from the record, for the reason that the defendant was not warned in any manner, nor was he told or made aware in any manner whatsoever that the statements that were made by him while in the squire's office would be used in the trial of this case against him.

By the Court: " I refuse the motion.    Exception noted for defendant, at whose request a bill is sealed." [15]

. The commonwealth proposed to prove by Fred Magenreider that he was present at the squire's office at the hearing and acted as interpreter with the last witness ; that the defendant there stated that he bought the revolver for $6.50, and when asked whether it was this side of the bridge, or the other side, he said this side, meaning the Olyphant side of the Lackawanna river bridge.    He said he loved Maria in the old country, and came here to marry her, and that she would not have him, and he shot her.

By counsel for defendant: " The counsel for the defendant objects to the offer because the prisoner was under arrest at the time, and that there appears to be no warning given to him that the statements that were made by him would be used against him on the trial of the case, and therefore it is incompetent."

By the Court: " The objection is overruled and evidence admitted.    Exception noted for defendant, at whose request a bill is sealed." [16]

The court charged in part as follows:

" [In this case we have only to deal with that kind of murder in the first degree, described as 'willful, deliberate and premeditated.'] [9] 'Many cases have been decided under this clause, in all of which it has been held that the intention to kill is the essence of the offense. Therefore, if an intention to kill exists, it is willful; if this intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate; and if sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, or to frame the plan to carry this design into execution, it is premeditated. The law fixes upon no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury, from all the facts and circumstances of the evidence.'

" In reviewing the testimony in this case you will find some important facts which cannot be disputed. That Maria Kerzek, in the borough of Olyphant, on the morning of October 9th last, while in the enjoyment of full life, received a pistol wound from a revolver in the hands of the defendant cannot be questioned; that this wound caused the girl's death, and that the pistol which the defendant had was purchased by him the morning of the shooting a short time before the tragic ending of Maria's life, are facts which stand before you uncontradicted, and are practically admitted by the defendant. The representative of the commonwealth contends that the circumstances surrounding the shooting justify you in finding only one kind of verdict: that of murder in the first degree; that the killing was willful, deliberate and premeditated; that the defendant, when disappointed on account of the refusal of the girl to marry him, and her determination to marry another man, became inspired with the spirit of revenge; that he prepared himself deliberately to carry out a murderous purpose; that he went to Lally's store on Monday evening to purchase a revolver, and only hesitated on account of the difference of a dollar and a half in the price; that he returned to Kramer's house where the girl lived and slept there during the night, and that in the morning, imbued with the same feeling and purpose, he left Kramer's house after breakfast, went to Lally's

store, purchased the revolver, paid $6.50 for it, loaded it with
five cartridges, and within the space of less than an hour's time
returned to Kramer's house, and on being again refused mar-
riage by the girl, shot and killed her. The commonwealth
contends that the circumstances of the shooting are consistent
with no other hypothesis than that of murder in the first de-
gree—a willful, deliberate and premeditated murder.

" I will now call your attention to the evidence in the case :

" Dr Kelly, the coroner, described the condition of the body,
the nature and extent of the wound, the finding of the bullet
at the base of the brain, and testifies as to the cause of death.

"Edward Rosenfeld is called, and says that while going home
from church he heard an alarm. His attention was attracted
to the Kramer house. He heard screaming, and thereupon he
went near the door, and saw Mrs. Kramer with a child on her
arm, the girl, Maria Kerzek, near her, and the defendant close
by with a revolver in his hand, pointed towards Maria. The
witness saw and heard the first shot fired by the defendant, and
and then ran away and heard two shots more fired. This, in
substance, is his testimony as to the shooting. I am not giv-
ing his exact words, you must consider his whole testimony,
and must rely upon your own recollection of the testimony of
the witnesses in deciding the facts of this case. It is my duty
to assist you in reviewing the evidence, but you, gentlemen of
the jury, are the sole judges of the facts. It is your exclusive
right and your supreme prerogative to determine the facts of
this case.

" George Adams is called next. He was attracted by Mrs.
Kramer's excited manner, and by three pistol shot reports.
He saw smoke coming out of the door of the Kramer house,
and soon after saw the defendant jump out of the house from
behind the door and run toward the river, with a number of
people, with hue and cry, running after him.

" Josephine Kramer, the sister of the deceased girl, and an
eyewitness to the shooting, testifies to the events which hap-
pened on Tuesday morning. She says that the defendant took
his breakfast on that morning, and went out of the house. He
returned about eight o'clock, finding Mrs. Kramer and Maria
in the dining room, Maria scrubbing the floor. The defendant
sat down at the table, and after a short time the witness, Mrs.

Kramer, discovered a revolver in his possession.   She then called the girl into the other room.   The defendant had just asked the girl to marry him, and she had refused.   As soon as both women went into the front room, the defendant followed them and fired three shots at Maria, the third taking effect. The witness says that the defendant was facing Maria when he fired the shots, and was close to her.   You saw the attitude of the witness on the stand demonstrating the manner in which the shots were fired, and the relative positions of the defendant and Maria.

" You will notice, gentlemen of the jury, that I am so far recalling the testimony as to the events immediately surrounding the shooting.   I will refer to other testimony in discussing other features of this case.

" The weapon used is produced here in court, and a witness, James Lally, is put upon the stand to show how the defendant obtained the revolver.   Mr. Lally states that the prisoner came to his store on Monday evening, October 8th, to purchase a revolver.   He pointed to one in the show-case, asking 'how much ? '   Mr. Lally said ' Six dollars and a half.'   Defendant offered five dollars, which was refused, and then left the store. The next morning the defendant comes to the store again, purchases the revolver for $6.50, buys the cartridges, and then leaves the store armed with a loaded revolver.

" The commonwealth has produced several witnesses, who describe the actions of the defendant, after the shooting and after he left the Kramer house, his running away rapidly, his pursuit by several citizens, his running into the river and there held at bay by several people on both banks of the river and his final surrender and capture.   The purpose and intended effect of this testimony is to show the flight of the defendant, his attempt to escape the consequences of his alleged crime. [Flight is considered as evidence of guilt.   It is your privilege to look upon this testimony in that light.   It will bear that construction.   You may also look upon it as evidence of fear on the part of the defendant—fear of summary punishment at the hands of his pursuers.   Weigh it carefully and give it the effect it reasonably should have.] [7]

" I will now call your attention to the testimony for the defense.   The defendant by himself and counsel, admits the pur-

chase of the revolver, and that Maria Kerzek came to her death by means of a shot fired from this revolver in the hands of the defendant. The defense is twofold. It is contended that the firing of the fatal shot was accidental; that while he was about to commit suicide and had the revolver under his chin, the girl took hold of his arm, and that in the scuffle that ensued the shots were fired and Maria was killed. The defendant also contends that the condition of his mind was such that he was not responsible for his acts; that his mind was unhinged, and that he did not know the consequences of his act.

" The provisions of our law in Pennsylvania permit the defendant in a homicide case to go upon the witness stand and testify in his own behalf. His credibility as a witness is for you, and you have a right to take into consideration the position of the defendant in relation to this case, and its possible consequences, in determining the weight you should give to his testimony.

" On the witness stand he gives you his history in Austria, his acquaintance with and engagement to Maria Kerzek; his service in the army, his sickness and detention in the hospital, or in an insane department of the hospital; his journey to Mayfield, Lackawanna county, arriving there October 7th last; his relations and conversations with Maria on Sunday and Monday; her refusal to marry him; his consequent sadness and grief; the purchase of the revolver on Tuesday morning; his return to Mrs. Kramer's house with the revolver in his pocket; the refusal again of Maria to marry him; his attempt to shoot himself; the interference of the girl and her consequent unfortunate death.

" Certain witnesses are called on behalf of the defendant, among them Joseph Petrocious, John Karocious, Anthony Kranz and Martin Sikon. Their testimony relates to the actions of the defendant in the hospital, his sickness, his crying and praying, his actions on Sunday and Monday in Mayfield and Olyphant, and other facts and details which you may recall, and which do not occur to me now. It is your duty to take into consideration all the testimony in the case. If you find any contradictions in the evidence you must examine them closely, and ascertain whether the contradictions are only apparent. If you can harmonize all the testimony it is your duty

to do so.   But if you cannot, then you have the right to believe or disbelieve any witness or any part of the testimony.

" The credibility of the witnesses is for the jury.   In deciding what weight you give to the testimony of a witness, you must take into consideration the interest of the witness in the possible result of the case, the accuracy of his recollection, his opportunity of observation as to the facts he testifies to, and the demeanor and appearance of the witness upon the stand.

" The question will naturally recur to you, was the shooting and killing of Maria Kerzek an accident as claimed by the defendant?   If it was, then the defendant cannot be convicted under this indictment.   The evidence on this part of the case is in the main that of the defendant.   I need not repeat it to you.   It is claimed by his counsel that the defendant is corroborated by Dr. Parke, the jail physician.   You have heard his evidence.   He says that in his judgment the wounds under the chin and below the lip were produced by a bullet.   The nature of the wound has been described to you.   Could a bullet traverse in the direction indicated by the wound without shattering the chin bone?   It is for you to decide.   [You heard the testimony of Mr. Cummings.   He examined the face of the defendant closely the day of the shooting, and found no wound under the chin.]  [13]   Then you have the testimony of George Adams, who says the defendant while running toward the river came in contact with a barbed wire fence, and injured his chin until blood came.   Then you have the fact that two bullet holes were found in the window frame in Mrs. Kramer's house, and one bullet in the deceased girl's brain; thus with the two loaded cartridges found in the revolver accounting for the five bullets.   If you find that the killing of Maria Kerzek was the result of an accident, then you must acquit the defendant.

"If you find that the killing was not the result of accident, then was the defendant insane when he committed the act, and unable to distinguish between right and wrong?   The law presumes every man to be sane.   Sanity is a man's normal condition.   If a defendant alleges insanity, either partial or general, as an excuse for crime, the jury must be satisfied from the evidence that the allegation is true.   Whether it be a hallucination or delusion, partial or general insanity, the test is that if a man has not sufficient power of memory and mind

to know the relation in which he stands to others, and others to him, if he does not understand the nature of his act, whether it is right or wrong, if his moral perception is so weakened that he cannot understand the consequences of his act, then he is not responsible and cannot be convicted of any crime whatever. Or if he is dominated by an uncontrollable and irresistible impulse, impelling him onward to the commission of a deed, and overpowering the will, then that is such a condition of mind as releases man from responsibility for his acts.

" [The evidence to sustain this contention of the defendant appears to be meager, but the evidence is for you to consider, and you must draw from it your own conclusions.] [8]   You have heard the testimony as to his actions in the Austrian Hospital, and as to his actions and words on Sunday and Monday and Tuesday morning in this country, and you have seen him upon the witness stand.   Are you satisfied, gentlemen, from the evidence that the defendant was not responsible when he committed the act charged against him ?   If you are, then he should be acquitted of this indictment on the ground of insanity."

Defendant's points were among others as follows :

" 8. In order to convict of murder in the first degree, the jury must find from the evidence in the case beyond a reasonable doubt that the mind of the defendant was not so affected, in consequence of the decedent's rejecting him and refusing to enter into the relations which had existed between them so long, thus unbalancing his mind, so as to be incapable of such deliberate premeditation as is necessary to constitute murder in the first degree.   *Answer :* Subject to my instructions to you, gentlemen of the jury, in regard to the question of this man's insanity, and applying the facts of the case to the law set forth in this point, I affirm it." [10]

" 17. That no positive evidence has been produced by the commonwealth to show that the killing was premeditated and deliberate, and that the circumstances under which the killing took place may be reconciled with the theory of the absence of such intent.   *Answer :* This point is refused.   It is for the jury to find the degree of his guilt." [11]

Verdict of guilty of murder in the first degree, upon which the court passed sentence of death.

*Errors assigned* were (1) refusal of court to grant continuance; (2, 3, 4, 5, 6, 13, 14, 15, 16) rulings on evidence, quoting the bill of exceptions; (7–11) instructions as above, quoting them. (12) The refusal of the court, at the request of the foreman, to have read to the jury all the evidence tending to show the condition of defendant's mind at the time of the homicide.

*G. M. Watson* and *George S. Horn*, *A. J. Colborn* with them, for appellant.

*John P. Kelly*, ex-district attorney, *John R. Jones*, district attorney, with him, for appellee.

OPINION BY MR. JUSTICE MCCOLLUM, May 30, 1895:

Frank Berchine, otherwise known as Frank Bezek, is under sentence of death for the murder of Maria Kerzek at Olyphant, Lackawanna county, on the 9th of October last, and the record of his trial and conviction is before us for review. It was his right to have an impartial trial in accordance with law, and if that was denied to him it is our duty on his appeal to afford him an opportunity for it by reversing the judgment. We were induced by his poverty to facilitate the review he sought by accepting the official stenographer's type-written copy of the testimony in lieu of its presentation in the paper-books as required by our rules. We have carefully examined and studied the testimony so furnished to us, and while we do not deem it necessary nor propose to analyze or discuss it in this opinion we unhesitatingly say that his conviction of murder of the first degree was fully warranted by it. It plainly shows that the homicide was a consequence of the refusal of the deceased to become his wife. Whether it was the result of an attempt by him to commit suicide, of a premeditated purpose to murder her, or of the unconscious act of a madman, were questions for the jury upon the evidence under proper instructions from the court.

There are sixteen specifications of error filed in the case, and we will consider them in their order. It is conceded by the learned counsel for the defendant that there is nothing upon the record on which to base the first specification, and this con-

cession, confirmed by an inspection of the record, is, technically speaking, a sufficient answer to it. Nevertheless, in favorem vitæ, we have considered it in the light afforded by their statement of the grounds for it and by the reply of the learned counsel for the commonwealth. So considered it appears to be founded upon a denial of the defendant's motion for a continuance of the case. As nothing short of an abuse of the discretion the trial court has in passing upon a motion of this character would justify our intervention, and as it does not appear that this discretion was abused in the case before us, the specification must be overruled. It is proper in this connection to add that nothing was shown in support of the motion which presented reasonable ground for believing that a postponement of the trial would result in strengthening the defense in any respect.

There is nothing in the offer which forms the subject of the second specification that raises any doubt concerning the correctness of the ruling upon it, except the portion of it which relates to the alleged confinement of the defendant in an insane asylum in Austria, and the exclusion of this appeared to us on first view as error which might authorize and perhaps call for a reversal of the judgment. The technical answer to this view is that where an offer blends irrelevant and inadmissible matters with a matter relevant and admissible, and it is made and rejected as a whole, the rejection of it is not error: Sennett v. Johnston, 9 Pa. 335, and Wharton v. Douglass, 76 Pa. 273. But in deciding the question raised by the specification we shall not take into consideration the rule supported by the cases cited. These were civil cases and if the rule stated in them is applicable to, it ought not to be summoned to sustain a ruling prejudicial to the interests of a defendant on trial for murder. The specification, however, fails to disclose the ruling immediately following the one in question, and under which the defendant was allowed to prove all material and admissible matters contained in the preceding offer, together with his acts, declarations and conduct while in Austria, and in this country, tending to show that he was insane when the homicide was committed. This ruling rendered the ruling complained of in the second specification harmless and without effect upon the defendant's rights, even though it be conceded there was error in its exclusion of that part of the offer relat-

ing to his confinement in an asylum.   Joseph Petrocious, John Karocious and Anthony Krantz who were his neighbors in Austria and whose acquaintance with him dates from the period of his childhood, testified to having seen him in a hospital at Liebach, five years ago, and to his acts and declarations there. That their testimony did not fully sustain the offer may be attributable to their want of knowledge or recollection of the matters to which their attention was called, but it is not charge-able to any ruling of the court.

The rulings complained of in the third and fourth specifications of error were not excepted to in the trial court and are not, under well-settled rules, reviewable here.   Besides, there is nothing discoverable in either of them which can be regarded with any show of reason as prejudicial to any right or interest of the defendant.   The matters to which they referred could not legitimately affect the decision of any question involved in the case.

The fifth, sixth, seventh, eighth, ninth and tenth specifications do not require elaborate discussion.   It is sufficient to say of the fifth and sixth that the offer made for the purpose of contradicting Mrs. Kramer related to immaterial matter and was based on an assumption not warranted by her testimony. The instructions in regard to the effect of the defendant's flight from the scene of the murder were, considered as a whole, unobjectionable, and so were the instructions concerning the evidence of his alleged insanity.   It is not claimed that the murder of Maria Kerzek was committed by means of poison, or by lying in wait, or in the perpetration of or attempt to perpetrate any arson, rape, robbery or burglary.   The jury were not required to consider a murder so perpetrated, and they were substantially so instructed in the language of Justice AGNEW in Com. v. Drum, 58 Pa. 16.   We do not assent to the claim that the instruction was misleading.   The defendant has no cause to complain of the answer to his eighth point.   The point was misleading and not a fair or correct statement of the law applicable to the defense of insanity.   It ignored the presumption of sanity and cast on the commonwealth the burden of showing by affirmative evidence, which excluded reasonable doubt, that the defendant was not insane when the homicide was committed.   Insanity is an independent defense and the decisions of this court say

that he who sets it up must show the existence of it by fairly preponderating evidence : Ortwein v. Com., 76 Pa. 421 ; Lynch v. Com., 77 Pa. 209 ; Brown v. Com., 78 Pa. 123 ; Meyers v. Com., 83 Pa. 131, and Pannell v. Com., 86 Pa. 260.

We see no error in the rulings or action complained of in the eleventh and twelfth specifications. There was direct as well as circumstantial evidence that the murder was " willful, deliberate and premeditated," and there was nothing said or done in relation to the jury's request in respect to the reading of the testimony which furnishes any ground for reversal or adverse criticism.

We are unable to find in the excerpt from the charge, which is the subject of the thirteenth specification, anything that could possibly prejudice the defendant's cause or mislead the jury.

There was no exception to the admission of Berger's testimony but there was an exception to the denial of the motion to strike it out. The reason assigned for the motion did not accord with the facts as shown by the evidence. Cummings testified distinctly that he warned the defendant that any statement he might make concerning the murder would be used against him, and that he need not say anything about it unless he desired to do so. The statements made by the defendant appear to have been voluntary and we cannot say they were misunderstood or misinterpreted by the witnesses who testified to them. We therefore see no valid reason for rejecting the evidence of them. Upon this review of the case we conclude that it was fairly tried and that all the specifications of error must be overruled.

The judgment is affirmed and it is ordered that the record be remitted for the purpose of carrying the sentence into execution.