## Commonwealth v. Albright.

*Karl E. Richards*, Assistant District Attorney, for Commonwealth.
*Thomas D. Caldwell*, for defendant.

WICKERSHAM, J., Dec. 22, 1930.—This defendant was indicted to the numbers and session above stated, charging him with an attempt to commit burglary; he was convicted. Thereafter he moved for a new trial, alleging the verdict was against the law and against the weight of the evidence. These objections were not pressed at the argument of this motion before the court *in banc*.

The third reason alleged for a new trial was: "The identity of the fingerprints having been offered in evidence, and this being uncorroborated by any other evidence identifying the defendant as the one who committed the crime, the jury's verdict of guilty was unwarranted."

The testimony was taken stenographically by the court reporter, from which it appears that on May 3, 1930, the home of John Grove and his wife, at No. 2804 Walnut Street, sometimes known as Main Street, in Penbrook, was broken into and an attempt made to steal property therefrom between the hours of 7.30 and 10.30 P. M. Entrance to the building was gained by breaking a small pane of glass near the doorknob of the rear door, and the glass broken in this manner was piled up on a small pile in the vestibule between the door above mentioned and the outside of the house, behind a carton. The glass in question, together with other glass in the door, was washed and cleaned at 3 P. M. on the date of the crime. These facts are not in controversy.

Upon examination of the broken glass, a fingerprint was discovered, although it was not at the time known whose fingerprint it was. The glass was carefully preserved, and several weeks later, when the defendant was arrested on another charge, his fingerprints were taken, with his consent. Upon examination of his fingerprints and the fingerprint on the glass, it was discovered that one fingerprint of the defendant was identical with the fingerprint on the glass in twenty-two particulars. This was established by the expert testimony of William F. Hoffman, a member of the State Police, acting as Chief of the Pennsylvania State Bureau of Criminal Identification. He was admitted as an expert without objection on the part of the defendant. It was also admitted by counsel for the defendant that two others experts whom the Commonwealth was prepared to produce would testify to the same effect as Mr. Hoffman. In addition, Mrs. Mary Vuchity testified that she saw the defendant passing the house of Mr. John Grove and his wife on the evening the crime was committed.

Mr. Hoffman testified that his work consists of classification and comparison of fingerprints; the supervision of filing of all data concerning crimes and criminals. He testified that he studied under Deputy Commissioner Fourrot and Captain Golden, who successively had charge of the New York City Identification Bureau, which was the first inaugurated in the United States; that he also studied under Mr. Bateman and with Mr. Steinberg, of Washington, and he studied all of the books that can be found in English on the subject, including some translations from foreign languages; and, in addition, he has had the benefit of the amount of work handled in the State Police Bureau, and that he has classified and compared in the past ten years approximately fifty to sixty thousand sets of fingerprints. After cross-examining the witness as to his learning as an expert, counsel for the defendant raised no objection to his qualification. This witness testified with great particularity to the several steps pursued in order to make a comparison between the fingerprint on the glass taken from Mr. Grove's house and the acknowledged fingerprints of the defendant. In answer to the following question of the court: ". . . In your opinion, was it the same finger that made the print on Exhibit No. 5 that also made the print on Exhibit No. 6?" the witness replied: "It is the same finger."

On cross-examination by counsel for the defendant, this question was asked: ". . . Now, Mr. Hoffman, finger-printing is not an exact science, is it?" to which the witness replied: "It is so considered."

The question being further pressed, the witness testified: "There is the same possibility of two fingerprints being the same as there is of two trees having the limbs and branches in the same relative position, due to the fact that each individual finger has from 60 to 80 or more of these characteristics that we have described, 22 in this particular print, and that you cannot get those characteristics in the same relative position in a print of two fingers any more than you can find limbs and branches of two trees in the same position if you were to hunt all over the world."

In answer to the further question, "You say you cannot find it; you might find it; you don't know that?" the witness stated: "It is an axiom that nature never created two things alike."

In answer to the question of the court: "Has anybody else ever found that?" the witness stated: "I have never heard of it, your Honor."

The question being pressed by counsel for the defendant as to whether by any chance there are fingers which have the same characteristics, the witness replied: "I know only from La Carte's lifetime study of fingerprints, and he is a famous French mathematician, and he stated it is not, that there is not one possibility in the figure of 2, followed by sixty naughts, which I cannot pronounce—the figure 2 followed by sixty naughts—he said in that number there is not one possibility of finding two fingerprints alike."

In our charge to the jury we laid these matters before them with great particularity, dwelling at some length on the question of reasonable doubt. To this charge no exception was urged by counsel for the defendant at the oral argument.

It will be noted that the conviction of the defendant rested largely on the uncorroborated testimony of the fingerprint expert and the photographs of the fingerprints themselves. The jury had before them Exhibits 5 and 6, being enlarged photographs of the fingerprint found upon the glass taken from the Grove house, and the fingerprints acknowledged by the defendant to be his. Aside from the testimony of the expert that the fingerprints were

identical in twenty-two respects, the jury could judge that for themselves by comparison of the two.

That expert testimony may be considered by the jury as part of the evidence in the case, the weight of which is for the jury, has been determined in many Pennsylvania cases: Pannell v. Com., 86 Pa. 260; Johnson v. Com., 115 Pa. 369, 384; Wells v. Leek, 151 Pa. 431, 438; Bollinger v. Gallagher, 170 Pa. 84, and Com. v. Shults, 221 Pa. 466.

A history of the use of fingerprints will, we think, prove enlightening. We find fingerprints have been used as a means of identification in China, Japan, India and Egypt for a great many years. It seems to be well settled, both in England and in this country, that evidence of the correspondence of fingerprint impressions for the purpose of identification, when introduced by qualified fingerprint experts, is admissible in criminal cases; the weight and value of such testimony being for the jury: Moon v. State, 22 Arizona, 48, 198 Pac. Repr. 288.

The historical facts and the more recent legal decisions upon the subject are collated in a very able opinion handed down by Wadhams, J., in the case of People v. Sallow, 100 Misc. Rep. 447, 165 N. Y. Supp. 915, 925, from which we quote the following:

". . . The first recorded fingerprints were used as a manual seal, to give a personal mark of authenticity to documents. Such prints are found in the Assyrian clay tablets in the British Museum. Fingerprints were first used to record the identity of individuals officially by Sir William Herschel, in Bengal, to check forgeries by natives in India in 1858. C. Ainsworth Mitchell, in 'Science and the Criminal,' 1911, page 51. Fingerprint records have been constantly used as a basis of information for the courts since Sir Francis Galton proved that the papillary ridges which cover the inner surface of the hands and the soles of the feet form patterns, the main details of which remain the same from the sixth month of the embryonic period until decomposition sets in after death, and Sir Edward Henry, the head of the Metropolitan Police Force of London, formulated a practical system of classification, subsequently simplified by an Argentine named Vucetich. . . . It is claimed that by means of fingerprints the metropolitan police force of London during the thirteen years from 1901 to 1914 have made over 103,000 identifications, and the magistrates' courts of New York City during the four years from 1911 to 1915 have made 31,000 identifications, without errror. . . .

"It was held in 1909 by the Lord Chief Justice of England that the court may accept the evidence of fingerprints, though it be the sole ground of identification: Castleton's Case, 3 Crim. App. 74. In People v. Jennings, 252 Ill. 534, 549, 96 N. E. Repr. 1077, 1082, 43 L. R. A. (N. S.) 1206, Mr. Chief Justice Carter, in holding such evidence admissible, states that 'there is a scientific basis for the system of fingerprint identification, and that the courts are justified in admitting this class of evidence; that this method of identification is in such general and common use that the courts cannot refuse to take judicial cognizance of it.' " See, also, the leading case of People v. Roach, 215 N. Y. 592, 604, 109 N. E. Repr. 618, 623.

In People v. Jennings, supra, Chief Justice Carter, of the Supreme Court of Illinois, after referring to the authorities on fingerprints, has this to say (see page 1081):

". . . These authorities state that this system of identification is of very ancient origin, having been used in Egypt when the impression of the monarch's thumb was used as his sign manual; that it has been used in the courts of India for many years and more recently in the courts of several European

countries; that in recent years its use has become very general by the police departments of the large cities of this country and Europe; that the great success of the system in England, where it has been used since 1891 in thousands of cases without error, caused the sending of an investigating commission from the United States, on whose favorable report a bureau was established by the United States Government in the war and other departments."

Mr. J. Edgar Hoover now has charge of the Criminal Identification Bureau of the United States Department of Justice. In an article prepared by him for the November, 1929, issue of "The Annals of the American Academy of Political and Social Science," Mr. Hoover states:

". . . History is replete with references to prove that even in ancient times man was aware of the peculiar permanent lineations described by the ridges of the fingertips. On the face of a cliff in Nova Scotia, for instance, can be found an Indian carving of the outline of a hand with ridges and patterns clearly but crudely marked. So, also, the Chinese had used the impression of the thumb as a counter-signature, and, according to Sir William Herschel, had even applied the idea to bank notes by placing a thumb impression partly on the counterfoil and partly on the note itself so that its genuineness might be easily established. . . .

"The first known scientific observation on finger ridges was made in 1686 by Malpighi, the father of the science of histology and a professor of anatomy at the University of Bologna, who tersely alluded to the ridges which 'describe different patterns.' . . .

"It remained for Doctor Henry Faulds, an English authority on the subject of fiactylography, to write the first article on the practical use of fingerprints for the identification of criminals. In 1880, Doctor Faulds, who was connected at that time with the Tsukiji Hospital at Tokyo, Japan, conducted experiments which definitely established that the varieties of individual fingerprint patterns were very great; that the patterns remained constant throughout life; and that even after the removal of ridges by the use of pumice stone and acid the patterns invariably grew out again 'with unimpeachable fidelity' to their originals."

Mr. Hoover states that in the National Division of Identification and Information in the United States Department of Justice they have approximately 2,400,000 cards now on file, totaling nearly 24,000,000 individual fingers.

## Evidence.

The weight to be given to the question of identity of a prisoner with the person committing a crime, as presented by the comparison of such person's fingerprints with fingerprints found at the scene of the crime, is a question for the jury. Such evidence is sufficient to support a conviction: Underhill's Criminal Evidence (3rd ed.), § 815, citing many authorities, among them being an Allahabad (India) case, apparently unreported but referred to in Emperor v. Sahdeo, 3 Nagpur, 1, 14, where it appeared the accused, a Kayesth, had left a thumbprint in blood on a lotah found near the body of a man he was accused of having murdered. He pleaded an *alibi;* and the Sessions Judge disposed of it in these words:

"In this land of lies, an ounce of good circumstance is worth many pounds of oral evidence, and even if, instead of two, two hundred Kayesths swore they had sat in a circle round the accused from 6 P. M. to 6 A. M., it would be nothing in my mind compared with the unexplained bloody thumbprint."

The High Court, in confirming the sentence of death passed in the case, referred to the thumbprint as "evidence upon which we can safely rely," and

added it was "conclusive of the presence of the appellant" at the scene of the murder.

Underhill also refers—see note, page 1126—to Castleton's Case, 3 Crim. App. (Eng.) 74, a burglary case, in which it appeared that the only evidence against defendant was that of fingerprints upon a candle left behind. An appeal was taken from a refusal of the trial judge to grant leave to appeal against a conviction. The Lord Chief Justice spoke as follows:

"We are clearly of opinion that this application must be dismissed. The suggestion has been made that these fingerprints may have been put there by some one else, but that suggestion was disposed of by the jury, who decided upon the evidence before them. Our attention has been drawn to the photographs of the impressions of the fingerprints. Looking at the middle finger particularly, as well as to the index finger of the right hand, we agree with the evidence of the expert at the trial."

At the trial of the instant case we left the question of the credibility of the expert witness, Hoffman, to the jury, and we think their verdict of guilty clearly determines that they believed the testimony of the expert witness, Hoffman, and so believing, it conclusively follows that the defendant was the person who entered the house of the Groves on the night in question with an attempt to steal.

It was further urged upon us that the defendant ought not to have been convicted, and the conviction ought not to stand on the uncorroborated testimony of the fingerprint evidence. There was some corroboration, however, as the defendant was seen in the vicinity the evening the crime was committed; and there is authority for such conviction in the instant case.

In the case of Parker v. The King, 14 C. L. R. (Australia) 681, 3 British Ruling Cases, 68, it was held:

"Where it is proved that a crime has been committed, resemblance of finger-prints may of itself, in connection with other circumstances, be sufficient evidence of the identity of an accused person with the person who committed the crime charged."

Writing the opinion of the High Court of Australia, it was said by Griffith, C. J.:

". . . We are asked to allow the point to be argued whether, when evidence of fingerprints is the only evidence of identity, it is sufficient to support a conviction. Leave is asked in the hope that the rule may be laid down that it is not. Signatures have been accepted as evidence of identity as long as they have been used. The fact of the individuality of the corrugations of the skin on the fingers of the human hand is now so generally recognized as to require very little, if any, evidence of it, although it seems to be still the practice to offer some expert evidence on the point. *A fingerprint is, therefore, in reality an unforgeable signature.* [Italics ours.] That is now recognized in a large part of the world, and in some parts has, I think, been recognized for many centuries. It is certainly now generally recognized in England and other parts of the English dominions. If that is so, there is in this case evidence that the prisoner's signature was found in the place which was broken into, and was found under such circumstances that it could only have been impressed at the time when the crime was committed. It is impossible under those circumstances to say there was no evidence to go to the jury."

We think the last quoted case is controlling in the instant case. We are impressed with its reasoning. There is in the instant case evidence that the prisoner's *"unforgeable signature"* was found in the place which was broken into and was found under such circumstances that it could only have been

impressed at the time the crime was committed. The window in this door had been washed by Mrs. Grove at 3 o'clock in the afternoon, and had not been touched by either herself or her husband after that time. The defendant's *"unforgeable signature"* was found on a piece of broken glass taken from the door by means of which he unlocked it on the inside and entered the house. We think the evidence was sufficient to support the conviction and the motion for a new trial is, therefore, overruled. The district attorney is directed to call the defendant for sentence.

From Homer L. Kreider, Harrisburg, Pa.